STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2021 CA 1046

ASG TECHNOLOGIES GROUP, INC.

VERSUS

OFFICE OF TECHNOLOGY SERVICES

JUDGMENT RENDERED:     JUN 3 0 2022

* * * * * * *

Appealed from
The 19th Judicial District Court
Parish of East Baton Rouge • State of Louisiana
Docket Number C691716 • Section 25

The Honorable Wilson Fields, Presiding Judge

* * * * * * *

Robert J. Burvant
Diana J. Masters
New Orleans, Louisiana
    *and*
Theresa H. Wang, *pro hac vice*
Seattle, Washington

COUNSEL FOR APPELLANT
PLAINTIFF—ASG Technologies
Group, Inc.


J. Wendell Clark
Mark L. Barbre
Baton Rouge, Louisiana

COUNSEL FOR APPELLEE
DEFENDANT—State of Louisiana,
Division of Administration, Office
of Technology Services


Carlos A. Romanach
Baton Rouge, Louisiana

COUNSEL FOR APPELLEE
DEFENDANT—State of Louisiana,
Division of Administration, Office
of General Counsel

* * * * * * *

BEFORE: MCCLENDON, WELCH, AND THERIOT, JJ.

**WELCH, J.**

In this contract dispute over certain software license agreements, ASG Technologies Group, Inc. ("ASG") appeals a district court judgment that denied its petition for judicial review and affirmed a final agency decision of the Commissioner of the Division of Administration (the "Commissioner") in favor of the State of Louisiana, Office of Technology Services ("OTS"). We affirm.

## FACTS AND PROCEDURAL HISTORY

ASG (f/k/a Allen Systems Group, Inc.) is a Delaware corporation that licenses software products for information management and IT systems management. On July 31, 1992, ASG and the Louisiana Department of Children and Family Services ("DCFS") entered into a Software License Agreement ("SLA"), which granted DCFS a perpetual software license for ASG-Zeke™ Scheduling for z/OS®.[1] On May 28, 2004, ASG and DCFS entered into a SLA, which granted DCFS perpetual software licenses for ASG-OASIS/DMS for z/OS®,[2] ASG-Zena™ Agent for Windows®-4, and ASG-Zena™ Cross Platform Server-Enterprise Edition.[3] On December 31, 2004, ASG and DCFS entered into a SLA, which granted DCFS perpetual software licenses for ASG-Zena™ Agent for Windows®-30 and ASG-Zena™ Client-20. On July 1, 2006, ASG and DCFS entered into a SLA, which granted DCFS perpetual software licenses for ASG-

---

[1] ASG-Zeke™ Scheduling is an automated process scheduler that schedules and dispatches batch tasks to automate production workloads. See "ASG-Zeke™ For Z/OS®," **ASG Technologies,** https://content.asg.com/MarketingCollateral/OperationsManagement/Datasheet-ASG-Zeke-for-zOS-en.pdf (last accessed March 8, 2022).

[2] OASIS is a collection of facilities that provide common system functions for the 'Z' products (*i.e.*, ASG-Zeke, ASG-Zena, ASG-Zebb, and ASG-Zara). OASIS enables the 'Z' products to be transported between operating systems (z/OS, VSE, and CMS). See "Product Overeview," **ASG Technologies,** https://docs.asg.com/op_azo_4.0/reference_guide/product_overview.htm (last accessed March 8, 2022).

[3] ASG-Zena™ is a multi-platform workload automation that enables operations teams to design, visualize, and automate IT processes and tasks. See "Optimize Operational Business Process Flows...," **ASG Technologies,** https://www.asg.com/en/Products/IT-Systems-Management/Operations-Management/Multiplatform-Workload-Automation/ASG-Zena.aspx (last accessed March 8, 2022).

OpsCentral™ Base, ASG-OpsCentral™ Client-15,[4] ASG-Workload Analyzer™, ASG-Workload Analyzer™ PC-8,[5] ASG-Workload Planner™, and ASG-Workload Planner™ PC-8.[6]

### *The 2011 SLA*

On July 1, 2011, ASG and DCFS entered into a SLA (the "2011 SLA"), which granted DCFS certain software licenses. Attachment A identified the licensed products, the license and maintenance fees, and the payment terms. Attachment A set forth that the software licenses listed therein were granted for a three-year term, commencing July 1, 2011, through June 30, 2014, for the "Total Fee" of $649,440.00 (inclusive of the license fees and annual maintenance fees for the three-year period). Attachment A set forth a three-year payment schedule—on July 1 of each year of the three-year term, the State agreed to pay $188,243.00 for the license fees and $28,237.00 for the maintenance fees. The 2011 SLA's termination clause provided that the State could terminate the SLA at any time for convenience by giving thirty days written notice to ASG.[7]

### *Attachments C and D*

On October 4, 2011, ASG and DCFS entered into Attachments C and D to the 2011 SLA, which granted DCFS one additional software license, for the "Total

---

[4] ASG-OpsCentral™ provides a standardized interface, which includes the ability to manage scheduling workloads for ASG-Zeke and ASG-Zena implementations. See "Centralized Management...," **ASG Technologies,** https://prd.asg.com/en/Products/IT-Systems-Management/Operations-Management/Multiplatform-Workload-Automation/ASG-OpsCentral.aspx (last accessed March 8, 2022).

[5] ASG-Workload Analyzer is a PC-based analysis tool that tracks and analyzes batch-processing performance, detects problem areas, and presents an analysis of processing in a graphic format that is easy to understand. See "ASG-Workload Analyzer" **ASG Technologies,** https://docs.asg.com/op_azm_7.0.1/user_guide/workload_analysis_and_planning.htm (last accessed March 8, 2022).

[6] ASG-Workload Planner extracts information from a scheduling system database and translates it into graphic flowcharts of workflow. See "ASG-Workload Planner" **ASG Technologies,** https://docs.asg.com/op_azm_7.0.1/user_guide/workload_analysis_and_planning.htm (last accessed March 8, 2022).

[7] The maintenance provisions for the Attachment A software licenses were set forth in Attachment B, as well as the provisions regarding the license grants and proprietary rights.

3

Fee" of $34,500.00 (inclusive of the license fee and annual maintenance fees) for the period of October 31, 2011, through June 30, 2012. Attachment C set forth that on October 4, 2011, the State agreed to pay $30,000.00 for the license fee and $4,500.00 for the maintenance fee.[8]

### *Attachments E and F*

On March 21, 2013, ASG and DCFS entered into Attachments E and F to the 2011 SLA, which granted DCFS one additional perpetual software license, for the "Total Fee" of $60,000.00 (inclusive of the license fee and annual maintenance fees) for the period of March 31, 2013, through June 30, 2016. Attachment E set forth a three-year payment schedule. The State agreed to pay $20,000.00 on March 31, 2013; $20,000.00 on July 1, 2014; and $20,000.00 on July 1, 2015.[9]

### *Attachments G and H*

On August 12, 2013, ASG and DCFS entered into Attachments G and H to the 2011 SLA. Therein, DCFS agreed to pay the maintenance fees on certain perpetual software licenses procured by the State in 1992, 2004, and 2006, for the "Total Fee" of $187,236.40 (inclusive of the annual maintenance fees) for the period of July 1, 2013, through June 30, 2014. Attachment G set forth that the State agreed to pay the "Total Fee" of $187,236.40 in one payment on July 1, 2013. Attachment G provided that the annual maintenance fees for the three-year term would be $190,981.08; thereafter, the annual maintenance fees would not increase by more than ten percent per year over the prior year's annual maintenance fees.[10]

---

[8] The maintenance provisions for the Attachment C software license were set forth in Attachment D, as well as the provisions regarding the license grants and proprietary rights.

[9] The maintenance provisions for the Attachment E perpetual software license were set forth in Attachment F, as well as the provisions regarding the license grants and proprietary rights.

[10] The maintenance provisions for the software licenses were set forth in Attachment H, as well as the provisions regarding the perpetual license grants and proprietary rights.

4

## Amendment 1

On June 24, 2014, ASG and DCFS entered into Amendment 1 to the 2011 SLA. Amendment 1 extended the term of the software licenses granted in Attachment A—from July 1, 2011, to June 30, 2017—for the "Total Fee" of $746,859.00. Amendment 1 set forth a three-year payment schedule—on July 1 of each year of the extended three-year term, the State agreed to pay $216,480.00 for the license fees and $32,473.00 for the maintenance fees.

## Attachment I

On December 3, 2014, ASG and DCFS entered into Attachment I to the 2011 SLA, which granted DCFS one additional software lease license, for the "Total Fee" of $18,000.00 (inclusive of the license lease fee and maintenance fees) for the period of November 25, 2015, through June 30, 2018. Attachment I contained an acceleration clause, which provided that in the event the 2011 SLA was terminated prior to July 1, 2018—either by the State, or by ASG upon a breach by the State—and the breach remained uncured for sixty days, any unpaid portion of the "Total Fee" would immediately become due and payable.

## Amendment 2

On January 5, 2015, ASG and DCFS entered into Amendment 2 to the 2011 SLA, in which DCFS assigned its rights and obligations pursuant to the 2011 SLA to the State of Louisiana, Office of Technology Services ("OTS").[11] OTS committed to annually renew maintenance services for five licensed software products, as set forth in a maintenance services fee chart contained in Amendment

---

[11] The Legislature created OTS in 2001 to manage information technology systems and services for executive branch state agencies. See La. R.S. 39:15.1 (enacted by 2001 La. Acts No. 772, § 1 (eff. July 1, 2001)). OTS has the authority to manage the State's IT contracts. See La. R.S. 39:15.3(B)(23).

5

2.[12] Additionally, Amendment 2 permanently terminated four of the perpetual software licenses listed in Attachment G.[13] Amendment 2 further terminated two prior SLAs entered into by the State and ASG—one on April 12, 2000 (the "2000 PSLA"), and one on March 27, 2002 (the "2002 SLA").

### *Attachment J*

On January 8, 2016, ASG and OTS entered into Attachment J to the 2011 SLA. Attachment J granted OTS two perpetual software licenses, for the "Total Fee" of $54,486.00 (inclusive of the license fees and annual maintenance fees) for the period of November 30, 2015, through November 29, 2018.[14] Attachment J set forth a three-year payment schedule—the State agreed to pay $43,214.00 on November 30, 2015; $5,636.00 on November 30, 2016; and $5,636.00 on November 30, 2017. Attachment J contained an acceleration clause, which provided that in the event the 2011 SLA was terminated prior to November 30, 2018—either by the State, or by ASG upon a breach by the State—and the breach remained uncured for sixty days, any unpaid portion of the "Total Fee" would immediately become due and payable.

### *Amendment 3*

ASG and OTS entered into Amendment 3 to the 2011 SLA, effective June 9, 2017, which granted OTS the right to utilize the fourteen software licenses identified in Amendment 3 for the benefit of all State agencies. Amendment 3 provided that OTS would make a "one-time, non-cancellable, non-refundable payment" of $306,870.00, for the exclusive use of those software licenses by all

---

[12] Specifically, the five licensed software that OTS committed to annually renew the maintenance fees on included: (1) ASG-JOB/SCAN®; (2) ASG-OASIS/DMS for z/OS; (3) ASG-Zena™; (4) ASG-Zeke™ Scheduling for z/OS; and (5) ASG-OpsCentral™.

[13] Specifically, Amendment 2 terminated the following four perpetual software licenses granted to the State on July 1, 2006: (1) ASG-Workload Analyzer™, (2) ASG-Workload Analyzer™ PC-8, (3) ASG-Workload Planner™, and (4) ASG-Workload Planner™ PC-8.

[14] Specifically, (1) ASG-Zena™ Agent for Linux-7, and (2) ASG-Zena™ Agent for Windows®-2.

State agencies. Amendment 3 further provided that "any previously committed payments under the [2011 SLA] are *not* impacted by this [amendment]. Those fees shall be due and payable to ASG as proscribed in the [2011 SLA] as if this Amendment No. 3 did not exist." Amendment 3 also contained a release of liability provision that provided upon ASG's receipt of the "Total Fee," OTS would be released "from any and all claims of liability related to the alleged unauthorized access of the [l]icensed [p]roducts by unauthorized agencies that may have occurred prior to the [e]ffective [d]ate of this Amendment."

### *Amendment 4*

ASG and OTS entered into Amendment 4 to the 2011 SLA, effective June 9, 2017, which granted OTS the right to utilize the twenty-eight software licenses identified in Amendment 4 for the benefit of all State agencies. Amendment 4 provided that OTS would make a "one-time, non-cancellable, non-refundable payment" of $323,096.00 for the exclusive use of those software licenses by all State agencies. Amendment 4 further provided that "any previously committed payments under the [2011 SLA] are *not* impacted by this [amendment]. Those fees shall be due and payable to ASG as proscribed in the [2011 SLA] as if this Amendment No. 4 did not exist." Amendment 4 (like Amendment 3) contained a release of liability provision that provided upon ASG's receipt of the "Total fee," OTS would be released "from any and all claims of liability related to the alleged unauthorized access of the [l]icensed [p]roducts by unauthorized agencies that may have occurred prior to the [e]ffective [d]ate of this Amendment."

### *Amendment 5*

ASG and OTS then entered into Amendment 5 to the 2011 SLA, effective July 1, 2017. Amendment 5 extended the term of the software licenses granted in Attachment A (and as amended by Amendments 1-4) for an additional three

7

years—from July 1, 2017, to June 30, 2020—for the "Total Fee" of $1,389,896.00. Amendment 5 set forth a three-year payment schedule as follows:

Total Fee: $1,389,896.00

| July 1, 2017 | License Fee: | $421,180.67 |
| | Maintenance Fee: | $126,354.00 |
| July 1, 2018 | License Fee: | $421,180.67 |
| July 1, 2019 | License Fee: | $421,180.66 |

Amendment 5 provided that if the State elected to purchase maintenance services for the remainder of the extended three-year term, the maintenance fees would be set at $126,354.00 annually. Amendment 5 further provided that the software licenses identified in Amendment 5 could be utilized for the benefit of all State agencies. Amendment 5 set forth:

> All other terms and conditions of the [2011 SLA] remain the same. The [2011 SLA] as amended and this Amendment No. 5 constitute the entire [2011 SLA] between the [p]arties. Any other oral or written communications between the [p]arties before or after its execution shall not alter its effects, unless the change or modification is in writing and signed by authorized representatives from both parties.

### ASG's Contractor Complaint

On May 31, 2018, OTS sent a "Termination of Convenience" notice to ASG, stating that OTS wished to terminate the 2011 SLA, effective July 1, 2018. OTS further stated that the State was entitled to the continued use of its perpetual software licenses to three software products—ASG-Zeke™, ASG-Zena™, and ASG-OASIS. OTS requested the license keys for the perpetually licensed products.

Thereafter, ASG submitted a protest (i.e., a "contractor complaint") to the State's Chief Procurement Officer[15] (the "CPO") on April 30, 2019, demanding that OTS pay the outstanding portion of the "Total Fee" set forth in Amendment 5 to the 2011 SLA, i.e., the two remaining payments of $421,180.67 and

---

[15] Paula Tregre is the State's CPO.

8

$421,180.66.[16] ASG argued that the "Termination of Convenience" provision contained in the 2011 SLA did not relieve OTS of its obligation to pay the remainder of the committed payments set forth in Amendment 5. ASG further argued that the three committed payments were not "predicated on use, rather Amendment 5 was executed to resolve an outstanding license compliance issue. The license fee payments [were] required whether or not the software [was] being used." ASG contended that it had the right to terminate the 2011 SLA for cause, based on the State's failure to pay the two remaining payments set forth in Amendment 5, and that ASG's prior communication to OTS regarding this licensing issue constituted written notice to OTS under the 2011 SLA.

OTS responded to ASG's contractor complaint on June 14, 2019. Therein, OTS stated that in early 2017, ASG and the State engaged in negotiations for the renewal of the 2011 SLA. OTS claimed that an initial quote provided by ASG was significantly more costly than the amount OTS had agreed to pay as part of the original 2011 SLA. With only a few days remaining before the 2011 SLA's extended term expired, OTS alleged it was forced to negotiate a three-year payment schedule since the State could not afford to pay the "Total Fee" in one lump sum payment. Since Amendment 5 clearly provided that all other terms and conditions of the 2011 SLA remained the same, OTS claimed that the "Termination for Convenience" provision allowed OTS to terminate the 2011 SLA at any time by giving thirty days written notice to ASG, without obligating OTS for the remainder of the term. OTS argued that after it gave ASG the required written notice, OTS was not obligated to pay the remaining two scheduled payments of $421,180.67 and $421,180.66 for the license fees under Amendment 5. Citing to emails between representatives for ASG (Cheryl Zabell, ASG Software Asset Manager) and OTS (Derek Williams, OTS Director of Data Center

---

[16] The Louisiana Procurement Code, La. R.S. 39:1551-1755, governs contractor complaints.

Operations), OTS argued that the parties agreed to the removal of certain "problematic" language from Amendment 5 that required immediate payment of the "Total Fee" upon termination. Specifically, the language, "any unpaid portion of the Total Fee shall immediately become due and payable hereunder" was removed from Amendment 5. Thus, OTS alleged it could exercise the "Termination of Convenience" provision without the requirement of paying any unpaid portion of the "Total Fee" set forth in Amendment 5. OTS further argued that ASG offered no logical explanation as to why the 2011 SLA's "Termination for Convenience" provision would not apply to Amendment 5 and why OTS would be forced to pay for software licenses it no longer accessed or used. Finally, OTS alleged that ASG's conduct amounted to a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La R.S. 51:1401, *et seq.*

ASG replied to OTS's response to its contractor complaint in a letter dated July 9, 2019, in which ASG stated that it disagreed "in full" with OTS's response. ASG argued that the license fee for Amendment 5 was split into three payments at OTS's request because OTS did not have the funds to pay the entire amount of the $1,389,896.00 "Total Fee" in one lump sum payment. ASG stated that it agreed to split the license fee into three payments because OTS was committing the State to pay the "Total Fee" of $1.389,896.00 over the three-year term, regardless of termination. ASG claimed that the State's commitment to pay the "Total Fee" set forth in Amendment 5 was intended to cure prior breaches by OTS. ASG alleged that in 2017, it discovered that OTS materially breached the 2011 SLA (and its Amendments and Attachments) by providing third parties access to ASG's software. ASG claimed that OTS agreed to cure the breach by entering into Amendments 3, 4, and 5—Amendments 3 and 4 provided that OTS could allow third-party state agencies and personnel exclusive access to the software, and Amendment 5 provided for OTS's ongoing use of the software. ASG further

argued that correspondence between the parties indicated that "OTS was aware that the Total Fee would be due, whether upfront or over the term...." ASG stated that OTS mischaracterized the email correspondence between Ms. Zabell of ASG and Mr. Williams of OTS. ASG claimed that the referenced "problematic" language—"any unpaid portion of the Total Fee shall immediately become due and payable hereunder"—was removed from Amendment 5 during the parties' negotiations only to "eliminate the immediacy of payment upon termination." Finally, ASG claimed that its actions did not give rise to a claim under LUTPA.

OTS responded to ASG's reply in a letter dated July 23, 2019, in which OTS stated that it "vehemently" disagreed with ASG's claim that the intent of Amendment 5 was to cure OTS's prior breaches. OTS argued that Amendments 3 and 4 were contracts for one-time payments with express language designed to serve as a "settlement" between the parties addressing certain alleged prior breaches, which were not at issue in Amendment 5. OTS pointed to the release of liability clauses present in Amendments 3 and 4, which stated that upon receipt of the "Total Fees" thereunder, "ASG hereby release[d] OTS from any and all claims of liability related to the alleged unauthorized access...." Amendment 5 contained no such release of liability language.

ASG responded on July 26, 2019. ASG argued that Amendment 5 did cure prior breaches by OTS and that the only reason Amendment 5 did not include the same release of liability language as Amendments 3 and 4 was because Amendment 5 was a "new term license agreement." ASG further claimed that Amendment 5 did in fact require a three-year commitment. Finally, ASG argued that the removal of the "problematic" language—"any unpaid portion of the Total Fee shall immediately become due and payable hereunder"—was intended to eliminate the requirement of the immediacy of payment. ASG did not expect to be paid immediately for the "Total Fee," but requested that OTS pay the outstanding

"Total Fee" on the contractually agreed-upon schedule. ASG only agreed to remove the "problematic" language with the understanding that the "Total Fee" would be paid in full, but was not required to be paid immediately in one lump sum.

The State's CPO issued her protest decision on August 2, 2019, denying ASG's claim that OTS must pay ASG the outstanding portion of the "Total Fee" set forth in Amendment 5 to the 2011 SLA.[17] The CPO held that ASG's claims were "not supported by the administrative record." The CPO ruled:

> The "Fees and Payment" provision in Amendment 5 provided for a "Total Fee" of $1,389,896.00 and three individual License Fee[s] in the amounts of $421,180.67, $421,180.67, and $421,180.66[,] which were due on July 1, 2017, July 1, 2018, and July 1, 2019[,] respectively.
>
> Additionally, the "Fees and Payment" provision provided that "All fees shall be payable by OTS upon receipt of an invoice," and that "All other terms and conditions of the SLA remain the same."
>
> Contrary to ASG's contentions, Amendment 5 does not reflect it was executed to resolve an outstanding license compliance issue and, significantly, did not provide that the Termination for Convenience provision would not apply.
>
> Unlike Amendments 3 and 4, Amendment 5 lacked a release of liability provision. Therefore, ASG's contention that Amendment 5 was executed to resolve an outstanding license compliance issue is not evident from its clear and explicit wording.
>
> Additionally and significantly, Amendment 5 lacks any language obligating OTS to pay the balance of the Total Fee if it terminated the SLA for convenience prior to its expiration date. ASG could have insisted upon such language, but it elected not to.
>
> Therefore, the clear and explicit wording of Amendment 5 did not create an obligation for OTS to pay the balance of the Total Fee upon exercising the Termination for Convenience clause in the SLA.
>
> Finally, for the sake of argument, even if Amendment 5 was not clear as to whether or not OTS remained obligated to pay the balance of the Total Fee after it exercised the Termination for Convenience clause in the SLA, the conduct of the parties before Amendment 5's execution indicates the parties' shared intent and understanding relative to the

---

[17] The CPO did not rule on the LUTPA allegations raised by OTS, stating that the Office of State Procurement Services lacked the "jurisdiction to resolve a claim brought forth under LUTPA as it falls outside of the Procurement Code." The Commissioner likewise did not rule on the LUTPA allegations.

disposition of the balance of the Total Fee if OTS terminated the SLA for convenience prior to its expiration date.

On June 27, 2017, Ms. Cheryl Zabell ("Zabell") of ASG emailed Derek Williams ("Williams") of OTS a draft of Amendment 5[,] which contained an acceleration clause obligating OTS to pay the Total Fee immediately if the SLA was terminated for any reason, including convenience, by OTS:

> Should this Agreement be terminated prior to July 1, 2020 by (i) Client for convenience, or (ii) ASG upon a breach by Client, which breach remains uncured after sixty (60) days notice thereof, of any material term, condition, representation, or warranty of this Agreement, any unpaid portion of the Total Fee shall immediately become due and payable hereunder.

Subsequent emails from ASG to OTS reflect that OTS objected to the acceleration clause, resulting in its removal by ASG from the Amendment 5 draft. Specifically, on June 28, 2017, at 6:29 PM, Zabell emailed Williams a revised draft of Amendment 5 and stated that the "additional language" had been removed:

> Hi Derek
>
> Here is Amendment 5 with the additional language removed. Please let me know when we should expect to receive the signed amendments.
>
> Thank you again for your help,
>
> Sincerely,
>
> Cheryl Zabell, Software Asset Manager

The final version of Amendment 5[,] which the parties executed[,] lacked the acceleration clause initially proposed by ASG. Therefore[,] the acceleration clause's removal by ASG upon OTS' request evidenced the parties' intent to retain the Termination for Convenience provision without any corresponding obligation upon OTS to pay the balance of the Total Fee. Therefore, OTS' termination for convenience of the SLA on May 31, 2018, relieved OTS from any obligation to pay any additional fees to ASG under the SLA.

## CONCLUSION

For the aforementioned reasons, ASG's claim to the sum of $842,361.33 under Amendment 5 to the "Software License Agreement between [ASG] and [OTS]" is hereby denied.

### *Appeal to the Commissioner*

ASG appealed the CPO's decision to the Commissioner on August 13, 2019.

ASG argued that OTS obligated the State to pay ASG for past non-compliance, in

13

addition to the ongoing use of ASG's software, through Amendments 3, 4, and 5 to the 2011 SLA. ASG contended that the "Total Fee" under Amendment 5 was owed by OTS, regardless of whether OTS validly terminated the 2011 SLA. ASG argued that Amendment 5 required OTS to pay the "Total Fee" of $1,389,896.00 in three installments, over the three-year term set forth therein. ASG alleged that Amendment 5 structured the "Total Fee" owed as a payment plan, not as three separate payments. While typically requiring up-front payment in full for a term software license, at OTS's request and for its benefit, ASG agreed to allow OTS to pay the "Total Fee" in three installments. ASG further argued that the CPO erred in finding that OTS may terminate the 2011 SLA, while retaining perpetual software licenses to ASG-Zeke™, ASG-Zena™, and ASG-OASIS. ASG contended that nowhere does the SLA provide for perpetual software license rights to survive termination of the SLA, arguing that the agreement's termination provisions do not provide for termination of anything less than the full SLA.

OTS responded to ASG's appeal. Therein, OTS maintained that the State fully satisfied any alleged past non-compliance issues with ASG; that OTS rightfully invoked a valid "Termination for Convenience" provision; that there were no outstanding payments due to ASG; and that OTS is permitted to continue to use the perpetual software licenses the State previously paid for—all that was terminated was the maintenance services for the perpetual software licenses. OTS noted that ASG raised the issue of post-termination use of the perpetual software licenses for the first time in its appeal to the Commissioner. OTS argued that this issue was not raised by ASG in its contractor complaint, nor did the CPO rule on this issue in her decision.

ASG replied to OTS's response, in which ASG argued that after OTS materially breached the 2011 SLA, OTS negotiated a deal with ASG that included payments for OTS's past non-compliance along with a going-forward license

component. The negotiations resulted in Amendments 3, 4, and 5, which were executed contemporaneously on June 30, 2017. ASG argued that the three-year license renewal in Amendment 5 was integral to the agreed-upon settlements of Amendments 3 and 4 for OTS's non-compliance. ASG claimed that OTS may terminate the 2011 SLA, but it must pay the remainder of the payment owed under Amendment 5. Finally, ASG argued that OTS cannot terminate software licenses and continue to the use the software. The license terms cannot be conflated with maintenance service provisions.

On October 18, 2019, the Commissioner rendered his appeal decision. First, the Commissioner found that OTS settled the allegations of unauthorized use by paying the one-time "Total Fees" set forth in Amendments 3 and 4. Next, the Commissioner found that the payment schedule in Amendment 5 did not constitute an "installment" payment plan. Finally, the Commissioner found that OTS retained the perpetual software licenses to use the ASG-Zeke™, ASG-Zena™, and ASG-OASIS software. The Commissioner affirmed the CPO's decision, finding that OTS owed no further fees to ASG and that there was no evidence to support the unauthorized use allegation by OTS of the perpetually licensed ASG-Zeke™, ASG-Zena™, and ASG-OASIS software.

### Judicial Review in the 19th JDC

ASG filed a petition for judicial review in the 19th JDC, appealing the Commissioner's October 18, 2019 final agency decision. OTS answered the petition for judicial review, generally denying ASG's allegations.

ASG filed its appellant brief, requesting that the district court reverse the Commissioner's decision; award ASG damages for breach of contract; and order OTS to remove all ASG software from its computing environment and pay two years' worth of damages, if the district court determined that OTS properly

15

terminated the 2011 SLA. OTS filed its appellee brief, requesting that the district court affirm the Commissioner's decision. ASG filed a reply brief.

Following a hearing on ASG's petition for judicial review, the district court took the matter under advisement and ordered the parties to submit post-hearing briefs. Upon receipt and review of the parties' post-hearing briefs, the district court orally affirmed the Commissioner's decision on April 14, 2021. The district court signed a judgment on judicial review in accordance with its oral ruling on May 14, 2021, affirming the Commissioner's decision and adopting as its written reasons for judgment the original and post-hearing briefs submitted by OTS. ASG now appeals.[18]

## STANDARD OF JUDICIAL REVIEW OF FINAL DECISIONS IN AGENCY ADJUDICATIONS AND DISCUSSION

The Louisiana Procurement Code, La. R.S. 39:1551-1755,[19] governs contracts entered into by the State for the procurement of supplies, services, or major repairs as therein defined. See **Unisys Corporation v. Louisiana Off. of Motor Vehicles Through Hodges**, 2018-0556 (La. App. 1st Cir. 12/28/18), 270 So.3d 637, 645; **Metairie West, LLC v. State**, 2016-0123 (La. App. 1st Cir. 10/31/16), 2016 WL 6534297, at *3 (unpublished); **KAS Properties, LLC v. Louisiana Bd. of Supervisors for Louisiana State University**, 2014-0566 (La. App. 1st Cir. 4/21/15), 167 So.3d 1007, 1009. Louisiana Revised Statutes 39:1673 applies to contract controversies, including breach of contract. Prior to filing an action in district court, a complaint or controversy must first be presented to the chief procurement officer (or her designee). La. R.S. 39:1673(B). In the event the controversy is not resolved by mutual agreement, the chief procurement officer (or

---

[18] ASG filed a motion for devolutive appeal on June 3, 2021. The trial court signed an order of appeal on June 14, 2021, notice of which was transmitted by the Clerk of Court on June 16, 2021.

[19] The Louisiana Procurement Code, found at La. R.S. 39:1551-1755, was enacted by 2014 La. Acts No. 864, §§ 1-2 (eff. Jan. 1, 2015). The Procurement Code was formerly found at La. R.S. 39:1504-1526 and was repealed by 2014 La. Acts No. 864, § 3 (eff. Jan. 1, 2015).

her designee) shall promptly issue a decision in writing. La. R.S. 39:1673(C). That decision is final unless the decision is fraudulent or the contractor timely appeals the adverse decision to the Commissioner of the Division of Administration. La. R.S. 39:1673(E). Similarly, in the event of an appeal to the Commissioner, the decision of the Commissioner is final unless it is fraudulent or the contractor timely appeals the adverse decision to the 19th JDC. See La. R.S. 39:1685(E) and 39:1691(C); **Metairie West, LLC**, 2016 WL 6534297, at *3.

Judicial review of a decision by the Commissioner on a contract or breach of contract controversy is governed by La. R.S. 39:1691. See La. R.S. 39:1685(E)(2). The exclusive means of obtaining judicial review of a decision by the Commissioner is an appeal to the 19th JDC. See La. R.S. 39:1691(C); **Unisys Corp.**, 270 So.3d at 645; **KAS Properties, LLC**, 167 So.3d at 1009. Any party aggrieved by a final judgment or interlocutory order or ruling of the 19th JDC may appeal or seek review thereof to the First Circuit Court of Appeal or the Supreme Court. See La. R.S. 39:1691(E).[20]

On appeal to the 19th JDC or the First Circuit Court of Appeal, the Louisiana Administrative Procedure Act (the "APA") governs the judicial review of final decisions in agency adjudications. Louisiana Revised Statutes 49:964(G) sets forth the exclusive grounds upon which an administrative agency's decision may be reversed or modified on appeal:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;

---

[20] Louisiana Revised Statutes 39:1691(E) applies to contracts executed after August 1, 2008. See 2008 La. Acts No. 789, § 2 (eff. July 7, 2008).

17

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(6) Not supported and sustainable by a preponderance of the evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.

Any one of the six bases listed in the APA is sufficient to modify or reverse an agency determination. **Johnson v. Strain**, 2015-0714 (La. App. 1ˢᵗ Cir. 11/6/15), 183 So.3d 562, 564.

### _Assignment of Error No. 1: Applicable Standard of Review_

In its first assignment of error, ASG argues that the district court erred by failing to conduct a _de novo_ review of the Commissioner's final decision on issues related to the interpretation of the 2011 SLA. OTS contends that the "arbitrary and capricious standard of review" set forth in the **Unisys Corp.** case is applicable to the district court's review of the Commissioner's decision on the interpretation of the parties' contract.

When reviewing an administrative final decision, the district court functions as an appellate court. **State in Int. of Caston**, 2020-0768 (La. App. 1ˢᵗ Cir. 2/19/21), 321 So.3d 419, 421, writ denied, 2021-00425 (La. 5/11/21), 315 So.3d 872. The district court's standard of review in reviewing the factual findings of an administrative agency is manifest error. **Matter of Cerwonka**, 2019-1291 (La. App. 1ˢᵗ Cir. 6/26/20), 308 So.3d 299, 304, writ denied, 2020-01108 (La.

11/10/20), 303 So.3d 1045. To the extent a party alleges the district court's decision was affected by an error of law, La. R.S. 49:964(G)(4) applies. See **Blanchard v. Allstate Ins. Co.**, 1999-2460 (La. App. 1st Cir. 10/18/00), 774 So.2d 1002, 1004, writ denied, 787 So.2d 997 (La. 2001). Thus, on legal issues, the district court gives no special weight to the findings of the administrative agency, but conducts a *de novo* review of questions of law and renders a judgment on the record. **Fire Tech v. Louisiana State Fire Marshal**, 2008-0841 (La. App. 1st Cir. 10/31/08), 2008 WL 4763508, at \*2 (unpublished).

The district court may only reverse an administrative final decision upon finding that the agency's action was arbitrary and capricious. **Matter of Cerwonka**, 308 So.3d at 304; **Unisys Corp.**, 270 So.3d at 647. An administrative agency's conclusion is "capricious" when it has no substantial evidence to support it. Likewise, the word "arbitrary" implies a disregard of evidence or the proper weight thereof. **Matter of Cerwonka**, 308 So.3d at 304.

Once a final judgment is rendered by the district court, an aggrieved party may seek review by appeal to the appropriate appellate court. La. R.S. 49:965; La. R.S. 39:1691(E); **Johnson**, 183 So.3d at 564. Our appellate review of the district court's judgment is *de novo*, without regard for the factual findings *or* the legal conclusions of the district court. **State in Int. of Caston**, 321 So.3d at 421; **Matter of Cerwonka**, 308 So.3d at 304. An appellate court sitting in review of an administrative agency reviews the findings and decision of the administrative agency, not the decision of the district court. **State in Int. of Caston**, 321 So.3d at 421.

In **Unisys Corp.**, this Court recognized that a claim or controversy between the State and a contractor arising out of a contract for professional services shall be resolved by the Commissioner pursuant to La. R.S. 39:1673 and 39:1681; and further, that the Commissioner's decision is subject to review by the 19th JDC

19

under La. R.S. 39:1691(C). See **Unisys Corp.**, 270 So.3d at 645-46. This court further held that in accordance with the APA, an agency's decision will not be reversed or modified in the absence of a clear showing that the administrative action was arbitrary or capricious. See **Unisys Corp.**, 270 So.3d at 647. Nothing in **Unisys Corp.** is at odds with the standard of review set forth in the APA under La. R.S. 49:964(G), nor with the applicable jurisprudence cited above.

Accordingly, we will engage in a *de novo* review of the Commissioner's final decision on legal issues related to contract interpretation. See La. R.S. 49:964(G); **Johnson**, 183 So.3d at 564-65; **Blanchard**, 774 So.2d at 1004. This assignment of error is without merit.

## LAW AND DISCUSSION

The 2011 SLA is a contract. See La. C.C. art. 1906. In analyzing contracts, we are guided by the general rules contained in articles 2045-2057 of the Louisiana Civil Code. Contracts have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. La. C.C. art. 1983; **Waterworks District No. 1 of DeSoto Parish v. Louisiana Department of Public Safety and Corrections**, 2016-0744 (La. App. 1st Cir. 2/17/17), 214 So.3d 1, 5, writ denied, 2017-0470 (La. 5/12/17), 219 So.3d 1103. Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. Thus, a contract between the parties is the law between them, and the courts are obligated to give legal effect to such contracts according to the true intent of the parties. La. C.C. art. 2045; **Hampton v. Hampton**, 97-1779 (La. App. 1st Cir. 6/29/98), 713 So.2d 1185, 1188-89. This intent is to be determined by the words and provisions of the contract. La. C.C. art. 2046; **Sanders v. Ashland Oil, Inc.**, 96-1751 (La. App. 1st Cir. 6/20/97), 696 So.2d 1031, 1036, writ denied, 97-1911 (La. 10/31/97), 703 So.2d 29.

Words and phrases in a contract are to be construed using their plain, ordinary, and generally prevailing meaning unless the words have acquired a technical meaning. La. C.C. art. 2047; **Maldonado v. Kiewit Louisiana Co.,** 2013-0756 (La. App. 1st Cir. 3/24/14), 146 So.3d 210, 218. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050; **McCary v. Oceaneering Int'l, Inc.,** 2017-1163 (La. App. 1st Cir. 2/27/18), 243 So.3d 613, 616. Where a contract is clear and explicit, and leads to no absurd consequences, no further interpretation may be made in search of the parties' intent, and courts must enforce the contract as written. La. C.C. art. 2046; **Sims v. Mulhearn Funeral Home, Inc.,** 2007-0054 (La. 5/22/07), 956 So.2d 583, 589.

*Assignment of Error No. 2: Amendments 3, 4, and 5 to the 2011 SLA*

In its second assignment of error, ASG contends that the district court erred by affirming the Commissioner's finding that the 2017 Amendments to the 2011 SLA—Amendments 3, 4, and 5—were "separate and distinct from one another rather than integral components of a single transaction." ASG argues that each of the 2017 Amendments expressly incorporated the other Amendments by reference, providing that each Amendment would not go into effect unless all three Amendments were executed together. As argued by ASG, "the contractual rights and obligations contained in each amendment were dependent on the parties' agreement to the rights and obligations in the other two. In this way[,] the total consideration flowing to OTS was dependent on the total consideration flowing to ASG under all three [Amendments]." ASG further claims that it "would not agree to provide the releases contained in Amendment Nos. 3 and 4 unless OTS agreed to pay the Total Fee set forth in all three of the 2017 Amendments, including the Total Fee set forth in Amendment No. 5." ASG further argues that "[n]o other

21

conclusion is possible because the [A]mendments expressly referred to one another and were amending the same underlying contract, the 2011 SLA."

Amendments 3, 4, and 5 are similar in that all three provided that each Amendment "must be fully executed by all the parties listed below on or before June 30, 2017" and "must be fully executed concurrently with" the other Amendments in order to be "valid." The record shows that Amendments 3, 4, and 5 were fully executed by the parties on June 30, 2017; *i.e.*, signed and dated by representatives of ASG; OTS; the State of Louisiana, Office of Procurement; and the State of Louisiana, Office of the Commissioner of Administration. Accordingly, under the plain language of the Amendments, each was "valid" and became effective on the dates set forth therein: Amendments 3 and 4 became effective on June 9, 2017; Amendment 5 became effective on July 1, 2017.

Other than the June 30, 2017 execution date, the Amendments differ in significant ways. The "Fees and Payment" provision of Amendment 3 set forth:

> In consideration of the foregoing, OTS hereby commits to make a one-time, non-cancellable, non-refundable payment to ASG of Three Hundred Six Thousand Eight Hundred Seventy US Dollars ($306,870.00 USD) ("Total Fee").

Similarly, the "Fees and Payment" provision of Amendment 4 set forth:

> In consideration of the foregoing, OTS hereby commits to make a one-time, non-cancellable, non-refundable payment to ASG of Three Hundred Twenty-Three Thousand Ninety-Six US Dollars ($323,096.00 USD) ("Total Fee").

In contrast, the "Fees and Payment" provision of Amendment 5 provided:

> Fees and payments to be:
>
> Total Fee: $1,389,896.00

| | | |
|---|---|---|
| July 1, 2017 | License Fee: | $421,180.67 |
| | Maintenance Fee: | $126,354.00 |
| July 1, 2018 | License Fee: | $421,180.67 |
| July 1, 2019 | License Fee: | $421,180.66 |

22

Should OTS elect to purchase maintenance services commencing July 1, 2018[,] and further provided there are no increases in capacity or usage above the limits licensed herein, the Maintenance Fee shall be $126,354.00 annually through the remainder of the Term [June 30, 2020].

Thus, while Amendments 3 and 4 provide for "one-time, non-refundable, non-cancellable" payments, Amendment 5 set forth a three-year payment schedule.

Additionally, Amendments 3 and 4 both contain identical "avoidance of doubt" clauses, which provide as follows:

For avoidance of doubt, any previously committed payments under the SLA are *not* impacted by this Amendment.... Those fees shall be due and payable to ASG as proscribed in the SLA as if this Amendment...did not exist.

Further, Amendments 3 and 4 both contain identical "release of liability" clauses, which provide as follows:

Upon ASG's receipt of the Total Fee above, ASG hereby releases OTS from any and all claims of liability related to the alleged unauthorized access of the Licensed Products by unauthorized agencies that may have occurred prior to the Effective Date of this Amendment.

The Commissioner ruled that OTS settled the prior allegations of unauthorized access and/or use by paying the one-time "Total Fee" set forth in Amendments 3 and 4. Our *de novo* examination of the "one-time, non-refundable, non-cancellable" payments, the "release of liability" provisions, and the "avoidance of doubt" provisions contained in Amendments 3 and 4—which are absent from Amendment 5—lead us to the same conclusion.

The language of the "release of liability" provisions in Amendments 3 and 4 are indicative of a settlement—upon receipt of the one-time payments, ASG agreed to release "OTS from any and all claims of liability related to the alleged unauthorized access" of the licensed software. The "Fees and Payment" provisions of Amendments 3 and 4 are further indicative of a settlement, requiring "one-time, non-refundable, non-cancellable" payments, while the "Fees and Payment"

23

provision of Amendment 5 sets forth a three-year payment schedule. Furthermore, the "avoidance of doubt" provisions in Amendments 3 and 4 provided that previously-committed payments for software licensed under the 2011 SLA were not impacted by Amendments 3 and 4. Amendment 5 did not contain either of those provisions, nor did it require payment of a one-time fee. The Commissioner reasoned:

> The fact that Amendments 3, 4[,] and 5 were executed concurrently does not suggest that the amendments are dependent on each other or an integral component of one settlement. Had that been the circumstance, the provisions could have been incorporated into one amendment instead of three, or a statement to that effect could have been included in each amendment.

Based on our *de novo* review of the record, we agree that Amendments 3 and 4 settled the previous alleged unauthorized use and/or access dispute between the parties. Accordingly, this assignment of error is without merit.

### *Assignment of Error No. 3: Interpretation of "Total Fee"*

In its third assignment of error, ASG argues that the district court erred by affirming the Commissioner's interpretation of the term "Total Fee" in Amendment 5 to mean "cancellable annual payments." ASG contends that the Commissioner's interpretation was inconsistent with the plain meaning of the term "Total Fee," the meaning ascribed to the same term in other provisions of the 2011 SLA, as well as the parties' prior conduct. ASG argues that multiple Attachments and Amendment 1 to the 2011 SLA all contain the term "Total Fee," which ASG claims refers to the total amount that OTS was required to pay, in full, under each particular Attachment or Amendment. ASG further argues that the parties' conduct lends to the interpretation that "Total Amount" meant the total amount owed by OTS for the software licenses it purchased—the payments in Amendment 5 were installment payments for a three-year license that was granted on the first day Amendment 5 became effective.

24

The Commissioner found that the payment schedule in Amendment 5 did not constitute a committed, "installment" payment plan. The Commissioner noted that Attachments A, E, and J to the 2011 SLA contained three-year payment schedules similar to the payment schedule contained in Amendment 5.[21] The "Fees and Payments" provisions of Attachments A and E contained the language, "The State has agreed to pay the Total Fee as follows....,"[22] while Attachment J's "Fees and Payments" provision stated, "Licensee has agreed to pay the Total Fees as follows...." The Commissioner reasoned that "[those] statements clearly signal that the Total Fee is being paid in installments." Unlike the language used in the "Fees and Payments" provision of those Attachments, Amendment 5 instead used the language, "Fees and payments to be...."

The Commissioner also noted that Amendment 2 to the 2011 SLA contained a chart showing the payment schedule for the annual renewal of maintenance services for software licensed under the SLA. That maintenance services fee chart showed that a "previously-committed payment" for maintenance fees in the amount of $20,000.00 was due on July 1, 2015. That payment represented the final payment "of three committed payments associated with [software] that was licensed pursuant to Attachment E to the SLA." As a reminder, the "Total Fee" for the software license granted under Attachment E was $60,000.00 (inclusive of the license fee and annual maintenance fees) for the period of March 31, 2013, through June 30, 2016. Attachment E set forth a three-year payment schedule, wherein the State agreed to pay $20,000.00 on March 31, 2013; $20,000.00 on July 1, 2014; and $20,000.00 on July 1, 2015. The Commissioner stated that the Amendment 2

---

[21] The Commissioner stated: "The 'Fees and Payments' section in each attachment indicates the 'Total Fee includes the License Fee for the Licensed Products and Annual Maintenance Fee for the period....' Attachment A further specifies a separate dollar amount for both the license fee and maintenance fee with each payment date. Attachments E and J do not."

[22] The Commissioner noted: "This statement appears in Attachments C and G, too, even though...each Attachment's term is one year and has only one payment date."

maintenance services fee chart's use of the phrase "previously-committed payment" confirmed that the three-year payment schedule in Attachment E was an "installment plan." Reading Attachments A, E, and J and Amendment 2 together with Amendment 5, and noting the differences among those payment provisions, the Commissioner concluded that the "Fees and Payments" provision of Amendment 5 did not constitute an "installment" payment plan.

The Commissioner further held that Amendment 5 was not an "installment-payment contract" as defined by La. R.S. 39:197(11) of Louisiana's information technology procurement law because the title to the licensed software remained with ASG.[23] The Commissioner noted that the Attachments to the 2011 SLA governing the maintenance and propriety rights of the licensed software did not deliver title to the OTS:

> The Licensed Product(s) are, and shall at all times remain, the property of Contractor and its licensors, and the State shall have no right, title, or interest therein, except as expressly set forth in this Agreement.

Nowhere in the 2011 SLA or any of its Attachments or Amendments is "Total Fee" defined. Amendment 5 does not include express language obligating the State to pay the full amount of the "Total Fee," as was used in other Attachments with similar three-year payment schedules. Several other examples

---

[23] Louisiana Revised Statutes 39:197(11) sets forth:

> "Installment-payment contract" means a contract which amends and is incorporated into a purchase contract and is utilized to finance with the vendor the purchase of certain equipment, including but not limited to information technology, desktop computers, server systems, storage systems, mobile computing systems, peripheral systems, software, related services, and related supplies or a contract which itself alone is utilized to procure such equipment from a contractor and provides therein for payment in a set of installments over a fixed period of time. An installment payment contract shall arrange for a method of financing with payment being made in a set of installment payments over a fixed period of time in accordance with the provisions of the contract and shall provide for the vendor to deliver title to the governmental body in accordance with such terms.

In its brief on appeal, however, ASG states that it does not, nor has it ever, asserted that the 2011 SLA is an "installment-payment contract" as defined in La. R.S. 39:197(11). ASG claimed that it simply "allowed" the "Total Fee" amount of $1,389,896.00 in Amendment 5 to be paid by OTS in three installments, "as that term is commonly understood."

demonstrating that "Total Fee" as used in Amendment 5 does not require full payment includes the following language in Attachment I:

> Should this Agreement be terminated prior to July 1, 2018 by (i) Client or (ii) ASG upon a breach by Client, which breach remains uncured after sixty (60) days notice thereof, of any material term, condition, representation or warranty of this Agreement, **any unpaid portion of the Total Fee shall immediately become due and payble hereunder.** [Emphasis added.]

Similarly, Attachment J, which contained a three-year payment schedule for the payment of its "Total Fee," included the following provision:

> **Licensee further agrees that this Agreement may not be terminated with respect to its obligation to pay in full to the Assignee (or its assignee) all of the payments described herein (regardless of whether or not Licensee or ASG has exercised its right to terminate this Agreement pursuant to its terms) and that Licensee's obligation to make all such payments is absolute and unconditional and not subject to any claims or defenses which Licensee may have against ASG.** [Emphasis in original.]

These examples demonstrate that the parties were sophisticated and clearly knew how to draft language to govern how and when the payment of the various "Total Fee" provisions contained in the Attachments and Amendments would occur. The "Total Fee" payment provisions either required full payment of the "Total Fee" at the time of signing the Attachment and Amendments, or, established a yearly payment schedule for payment of the "Total Fee." And in some instances—like Attachments I and J—the "Total Fee" payment provisions required the payment of the full amount of the "Total Fee" in the event the 2011 SLA was terminated.

Thus, the language contained in the 2011 SLA demonstrates that there was express language that would unambiguously establish the parties' intent that full payment of a "Total Fee" was required regardless of license usage or the fulfillment of the term. None of that language appears in Amendment 5. The record further shows that ASG proposed a version of Amendment 5 that contained language similar to the "accelerated payment" provisions of Attachments I and J,

but OTS rejected that language, and it does not appear in the final version of Amendment 5.

Based on an interpretation of all the relevant language of the documents between the parties, it is clear that Amendment 5 did not establish an obligation for OTS to pay the full amount of the "Total Fee" of Amendment 5 when the 2011 SLA was terminated for convenience. This assignment of error is without merit.

### Assignment of Error No. 4:  The Perpetual Software Licenses

In its fourth assignment of error, ASG argues that the district court erred by affirming the Commissioner's decision to allow OTS to terminate the 2011 SLA but continue to use the perpetual software licenses to ASG-Zeke™, ASG-Zena™, and ASG-OASIS (the "disputed software"). ASG contends that the Commissioner's ruling that the disputed software was perpetually licensed prior to the effective date of the 2011 SLA leads to the erroneous conclusion that the 2011 SLA only governed maintenance services for the disputed software. ASG argues that the Commissioner's conclusion that when the 2011 SLA was terminated, only OTS's right to maintenance services terminated with it, and OTS could continue to use the disputed software, "rests on a profound misinterpretation of the 2011 SLA."

In his ruling, the Commissioner found that OTS retained the perpetual software licenses to the disputed software. The Commissioner noted that the State obtained the perpetual software licenses long before the parties entered into the 2011 SLA and that there was no evidence the State terminated the perpetual software licenses when it terminated the 2011 SLA for convenience.

Attachments A and B (as amended by Amendments 1-5), C and D, E and F, I, and J are Attachments to the 2011 SLA where ASG *expressly granted* OTS licenses "to use the proprietary software system(s)" listed in each Attachment for the applicable term, provided that OTS paid the license fees. Attachment A

28

provided, "[t]he license granted is for a three (3) year term..." and "[t]he Licensed Product(s) consist of the Original Licensed Product(s) listed below." (Emphasis removed.) Attachment B set forth that the licenses granted in Attachment A were the "non-assignable, non-exclusive and non-transferable license to use the proprietary software system(s)...listed on Attachment A and B for a three (3) year term provided the applicable license fees have been paid." The "Fees and Payments" provision provided that the "Total Fee" "includes the License Fee for the Licensed Products and Annual Maintenance Fees...." Attachment C provided, "[t]he license granted is for an eight (8) month term..." and "[t]he Licensed Product(s) consist of the Original Licensed Product(s) listed below." (Emphasis removed.) Attachment D set forth that the licenses granted in Attachment C were the "non-assignable, non-exclusive and non-transferable license to use the proprietary software system(s)...listed on Attachment A and B[24] [*sic*] for [an] eight (8) month term provided the applicable license fees have been paid." The "Fees and Payments" provision provided that the "Total Fee" "includes the License Fee for the Licensed Product and Annual Maintenance Fees...." Attachment E provided, "[t]he license granted herein is perpetual." Attachment F set forth that the licenses granted in Attachment E were the "non-assignable, non-exclusive and non-transferable license to use the proprietary software system(s)...listed on Attachment E and F perpetually provided the applicable license fees have been paid." The "Fees and Payments" provision provided that the "Total Fee" "includes the License Fee for the Licensed Product and Annual Maintenance Fees...." Attachment I granted a lease license; the "Fees and Payments" provision provided that the "Total Fee" "includes the License Fee and all of the Maintenance Fees...." Attachment J granted a perpetual license; the "Fees and Payments" provision

---

[24] It appears that the drafter of this Attachment erroneously listed "A and B" instead of "C and D."

provided that the "Total Fee" "includes the License Fee for the Licensed Product(s) and all of the Annual Maintenance Fees...." Attachment J further provided: "The license granted herein is perpetual. ...Licensee may elect to cancel maintenance services and *retain the right to use the Licensed Product(s)....*" (Emphasis added.) Attachment J contemplated a scenario where the 2011 SLA was terminated, providing that "Licensee further agrees that this Agreement may not be terminated with respect to its obligation to pay in full to the Assignee (or its assignee) all of the payments described herein...." (Emphasis removed.)

In contrast, Attachments G and H—which govern the disputed software—contain no language expressly granting any perpetual licenses. Attachment G contains a section titled "Original Licensed Product(s)," which provides a list of prior perpetually licensed software (including the disputed software) and the dates those licenses were granted. The "Fees and Payments" provision states: "The Total Fee includes the Annual Maintenance Fees...." Attachment H provided as to the license grants:

> Contractor hereby grants to the State, and the State hereby accepts from Contractor a non-assignable, non-exclusive and non-transferable **license to use** the proprietary software system(s) including programs..., technical and other documentation..., and any associated data and information **listed on Attachment G and H perpetually** *provided the applicable license fees have been paid.* [Emphasis added.]

There is nothing in the record to indicate that the State had not already paid the perpetual license fees for the software listed in Attachment G at the time Attachments G and H were executed. The fact that the "Total Fee" listed in Attachment G only covered maintenance fees for the disputed software further supports that conclusion. Accordingly, the plain language of Attachments G and H shows that the State was granted perpetual licenses to use the disputed software under agreements executed in 1992 and 2004, and the parties thereafter executed Attachments G and H to govern the terms of maintenance and upgrade services for

that perpetually licensed software. Attachments G and H represent a maintenance agreement, whose termination in conjunction with the termination of the 2011 SLA had no effect upon the perpetual licenses granted to the State.

We agree with ASG that it retains proprietary rights to the disputed software. Attachment H sets forth: "The Licensed Product(s) are, and shall at all times remain, the property of Contractor...and the State shall have no right, title, or interest therein, except as expressly set forth in this Agreement." A plain reading of Attachments G and H, together with the whole of the 2011 SLA, shows that OTS paid for and had obtained licenses to *perpetually use* the disputed software. Where a software user (OTS) pays a one-time fee in return for a "paid-up" license that allows it to use the software program perpetually so long as the terms of the license are not violated, the transaction bears a strong resemblance to a sale. The fact that the supplier (AGS) retains title to the software program copy may be viewed as insignificant since there is little expectation that the copy will ever be returned. See "¶ 7310, Coverage of Licenses Under Article 2," **Guide to Computer Law**, 2015 WL 6986660 (2022).

Our *de novo* review of the record further shows that OTS continued to use the perpetually licensed software in accordance with the contracted scope of use and has never claimed ownership of the software, nor attempted to assign or transfer its perpetual license rights. In a June 25, 2018 email that the State's Chief Information Officer sent to ASG, OTS clarified that after OTS terminated the 2011 SLA for convenience, it was merely dropping maintenance services for the disputed software, but its termination "should not be interpreted as a request to relinquish usage rights for any perpetually licensed product." Furthermore, ASG's conduct post-termination indicates that ASG consented to OTS's continued use of the disputed software. When OTS needed to transfer one of the disputed perpetually licensed software products to a more powerful computer—which is

31

consistent with its perpetual license agreement—the record shows that ASG executed the upgrade, charging OTS $115,399.00 for the upgrade service and accepting payment thereof.

From our *de novo* review of the record, we conclude that when OTS terminated the 2011 SLA for convenience, OTS terminated maintenance services for the disputed software. Contrary to the assertions of ASG, there is no provision in the 2011 SLA nor in any of the Attachments or Amendments, which terminate OTS's perpetual licenses to use the disputed software. Absent any language in the 2011 SLA terminating OTS's right to perpetually use the disputed software, OTS retains the right to do so pursuant to the 1992 and 2004 perpetual license grants. For these reasons, we find that this assignment of error is without merit.

## DECREE

We affirm the district court's May 14, 2021 judgment on judicial review. All costs of this appeal, in the amount of $4,230.00, are assessed to ASG Technologies Group, Inc.

**AFFIRMED.**